IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| South Carolina Citizens for Life, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 4:06-cv-2773-TLW |
| | ) | |
| Kenneth C. Krawcheck, Marvin D. Infinger, | ) | |
| Edward E. Duryea, Johnnie M. Walters, | ) | |
| Robert A. Bruce, Priscilla L. Tanner, | ) | |
| Susan P. McWilliams, all in their official | ) | |
| capacities as commissioners of the South | ) | |
| Carolina Ethics Commission, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# ORDER

South Carolina Citizens for Life, Inc. ("plaintiff") filed this civil action for declaratory and injunctive relief against Kenneth C. Krawcheck, Marvin D. Infinger, Edward E. Duryea, Johnnie M. Walters, Robert A. Bruce, Priscilla L. Tanner, and Susan P. McWilliams ("defendants"), all in their official capacities as commissioners of the South Carolina Ethics Commission, challenging the constitutionality of South Carolina law. The plaintiff filed a motion for summary judgment on September 8, 2009. (Doc. #108). The defendants filed a response to this motion on October 2, 2009. (Doc. #118). The plaintiff filed a reply on October 20, 2009. (Doc. #123). The defendants also filed a cross-motion for summary judgment on October 2, 2009, to which the defendants filed a response on October 27, 2009. (Docs. #117, #124). The defendants filed a supplemental memorandum on May 10, 2010, to which the plaintiff replied on May 11, 2010. (Docs. #129, #130). This Court held a hearing on the parties' motions on May 13, 2010. The plaintiff filed a supplemental memorandum

on September 13, 2010. (Doc. #133). The Court has carefully considered the motions, memoranda, and arguments of the parties. This matter is now ready for disposition.

## FACTS

The plaintiff South Carolina Citizens for Life, Inc. is a non-profit membership corporation that is incorporated in the State of South Carolina. (Am. Compl.). South Carolina Citizens for Life, Inc. is the state affiliate of the National Right to Life Committee. (Am. Compl., Ex C). The corporate office is located in Columbia, South Carolina, and the plaintiff has a local chapter that meets in Florence County, South Carolina. (Am. Compl.). According to the plaintiff's bylaws, the primary purpose of the corporation is to "gather and disseminate factual information on the human life issues of fetal development, abortion and abortion alternatives, infanticide and euthanasia by developing and maintaining educational programs." (Am. Compl., Ex B). The plaintiff notes that one means it uses to advance its pro-life mission is to educate the public about the positions of candidates for public office on pro-life issues. (Am. Compl.). The record indicates that the plaintiff's organization also maintains an educational fund as well as separately funded state and federal internal political action committees, or PACs. (Am. Compl., Ex C ).

In 1991, South Carolina enacted the Ethics Act to allow state officials to monitor and oversee the state election process. The South Carolina Ethics Commission is an agency of the State of South Carolina responsible for the enforcement of the Ethics Act. The mission of the Ethics Commission is to carry out the General Assembly's mandate to maintain public trust by ensuring compliance with the state's laws on financial disclosure; lobbyist/lobbyist's principal disclosure and campaign disclosure; regulating lobbyists and lobby organizations; issuing advisory opinions interpreting the statute; educating public officeholders and the public on the requirements of the state's ethics laws;

and prosecuting violators either administratively or criminally. State Ethics Commission, *Mission Statement*, http://ethics.sc.gov/aboutus/Commission/Agency+Mission.htm. The statutes pertaining to the Commission and its governance, powers, and responsibilities are found at Title 8, Chapter 13 of the 1976 Code of Laws. The General Assembly has assigned numerous responsibilities to the Commission. See S.C. Code Ann. § 8-13-320. Of particular importance to this case, the Commission has the authority to determine whether a person has failed to comply with the disclosure requirements contained in the Ethics Act, S.C. Code Ann. § 8-13-320(7); to request that the attorney general initiate a civil or criminal action for the purposes of enforcing the Ethics Act, S.C. Code Ann. § 8-13-320(9); to receive and investigate complaints for failure to file statements required by the Ethics Act, S.C. Code Ann. § 8-13-320(9); and to recommend disciplinary action for violations of the Ethics Act, S.C. Code Ann. § 8-13-320(10).

The plaintiff alleges that it planned to distribute a direct mail "voter guide" in advance of the November 7, 2006 general election for District 79 of the South Carolina House of Representatives. The voter guide was to be compiled based on responses to a Candidate Survey forwarded to the candidates by the plaintiff.[1] The proposed voter guides would provide the candidates' political affiliation, as well as their positions on various pro-life issues. The plaintiff alleges that it planned to spend approximately $15,000 to create and distribute the voter guides for the 2006 House District

_____

[1] If the candidate did not respond to the survey, the record indicates that the plaintiff would also look to outside surveys for information on the candidate's views, such as the "Project Vote Smart Survey," where available. (Am. Compl., Ex. D) (sample voter guide).

79 general election.  The plaintiff also alleges that it intends to distribute materially similar voter guides before future elections that will fall under the statutes challenged in this case.[2]

On September 22, 2006, SCCL requested an informal and formal advisory opinion from the defendants concerning the legality of the voter guides.  (Am. Compl., Ex. E).  On September 29, 2006, the defendants responded to the request by declining to render an informal opinion.  (Am. Compl., Ex. F).  Under South Carolina law, the Ethics Commission is not required to issue an informal advisory opinion.[3]  In its response, the Commission stated that it could not render an informal advisory opinion because the issues raised were never previously addressed by the Commission.  (Am. Compl., Ex. F).  The Commission added that "since the constitutionality of § 8-13-1300(31)(c) is currently in litigation,[4] it is the staff's opinion that this matter should be resolved by a formal opinion of the full Commission," and noted that "[t]he next meeting of the Commission is scheduled for November 15, 2006."(Am. Compl., Ex. F).  The defendants inquired as to whether SCCL wanted this issue placed on the agenda for the next meeting.  (Am. Compl., Ex. F).  Following this communication, SCCL filed the instant action on October 4, 2006.

---

[2]Even though SCCL's intended communications were pointed towards a past election, mootness does not bar this case.  It is reasonable to conclude, based on the record before the Court that this case falls within an exception to the rules on mootness as one that is capable of repetition yet evades review because of the length of time required for the courts to resolve the matter.  Virginia Society For Human Life, Inc. v. Federal Election Commission, 263 F.3d 379, 390 n. 3 (4th Cir. 2001) citing Defunis v. Odegaard, 416 U.S. 312, 318-19(1974).  Furthermore, SCCL has alleged that it intends to distribute voter guides in future elections.

[3]S.C. Code of Regs. 52-301 to 303 set forth the procedures by which the Commission is to render these advisory opinions.  These mandates provide that any person to whom the Act could reasonably be expected to apply can request an advisory opinion upon written request.  The Code of Regulations delineates between informal advisory opinions and formal advisory opinions.  The Commission will only provide an informal advisory opinion, "if appropriate."  S.C. Code Reg. 52-302.  However, a "formal advisory opinion shall be considered by the Commission at a public meeting," and the person requesting that opinion "may appear at the meeting."  S.C. Code Reg. 52-303.  This procedure has been in effect since 1997.  S.C. Code Regs. 52-301-303 (2009).

[4]See South Carolinians for Responsible Government v. Krawcheck, et al., 3:06-cv-01640-MJP, filed in the United States District Court for the District of South Carolina, Columbia Division, on May 30, 2006.

In this action, the plaintiff challenges the constitutionality of two provisions of the South Carolina Ethics Act. More specifically, the plaintiff alleges (1) the term "committee" found in S.C. Code Ann. § 8-13-1300(6) is facially unconstitutional for overbreadth; (2) the term "influence" found in S.C. Code Ann. § 8-13-1300 (31)(c) is facially unconstitutional for overbreadth; and (3) the term "influence" found in S.C. Code Ann. § 8-13-1300 (31)(c) is facially unconstitutional for vagueness. In its briefing, the plaintiff has further alleged that these specific provisions are unconstitutional as-applied to the plaintiff's organization.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the defendants are entitled to summary judgment if the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). As the party seeking summary judgment, the moving party bears the initial responsibility of informing this Court of the basis for its motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This requires that the moving party identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of genuine issues of material fact. Celotex, 477 U.S. at 323; see also Anderson, 477 U.S. at 249.

Though the moving party bears this initial responsibility, the nonmoving party must then produce "specific facts showing a genuine issue for trial." Fed R. Civ. P. 56(e)(2); see Celotex, 477 U.S. at 317. In satisfying this burden, the nonmoving party must offer more than a mere "scintilla

of evidence" that a genuine issue of material fact exists, <u>Anderson</u>, 477 U.S. at 252, or that there is "some metaphysical doubt" as to material facts. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must produce evidence on which a jury could reasonably find in its favor. <u>See</u> <u>Anderson</u>, 477 U.S. at 252.

In analyzing a motion for summary judgment, this Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. <u>See</u> <u>Miltier v. Beorn</u>, 869 F.2d 848 (4th Cir. 1990). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." <u>Matsushita</u>, 475 U.S. at 587 (1986) (internal quotations omitted).

## I. Overbreadth Challenge to South Carolina's Definition of "Committee."

In its first ground for relief, the plaintiff asserts that the phrase "committee" as defined by the South Carolina Ethics Act is facially unconstitutional for overbreadth. The South Carolina Ethics Act provides:

"**Committee**" means an association, a club, an organization, or a group of persons which, **to influence the outcome of an elective office**, receives contributions or makes expenditures in excess of five hundred dollars in the aggregate during an election cycle. It also means a person who, to influence the outcome of an elective office, makes:

(a) contributions aggregating at least twenty-five thousand dollars during an election cycle to or at the request of a candidate or a committee, or a combination of them; or

(b) independent expenditures aggregating five hundred dollars or more during an election cycle for the election or defeat of a candidate.

"Committee" includes a party committee, a legislative caucus committee, a noncandidate committee, or a committee that is not a campaign committee for a candidate but that is organized for the purpose of influencing an election.

S.C. Code Ann. § 8-13-1300(6) (emphasis added).

The Ethics Act further defines the phrase "influence the outcome of an elective office" by providing:

"**<u>Influence the outcome of an elective office</u>**" means:

(a) expressly advocating the election or defeat of a clearly identified candidate using words including or substantially similar to "vote for", " elect", "cast your ballot for", "Smith for Governor", "vote against", " defeat", or "reject";

(b) communicating campaign slogans or individual words that, taken in context, have no other reasonable meaning other than to urge the election or defeat of a clearly identified candidate including or substantially similar to slogans or words such as "Smith's the One", "Jones 2000", "Smith/Jones" , "Jones!", or "Smith-A man for the People!"; or

(c) **any communication made, not more than forty-five days before an election, which promotes or supports a candidate or attacks or opposes a candidate, regardless of whether the communication expressly advocates a vote for or against a candidate.** For purposes of this paragraph, "communication" means (i) any paid advertisement or purchased program time broadcast over television or radio; (ii) any paid message conveyed through telephone banks, direct mail, or electronic mail; or (iii) any paid advertisement that costs more than five thousand dollars that is conveyed through a communication medium other than those set forth in subsections (i) or (ii) of this paragraph. "Communication" does not include news, commentary, or editorial programming or article, or communication to an organization's own members.

S.C. Code Ann. § 8-13-1300(31) (emphasis added).

Designation as a "committee" under the South Carolina Ethics Act involves a number of organizational, administrative, reporting, and funding requirements.  For example, any group that qualifies as a "committee" under the Act is required to: (1) maintain records of contributions, contributors, and expenditures, S.C. Code Ann. § 8-13-1302; (2) file a statement of organization, S.C. Code Ann. §§ 8-13-1304, 1306; (3) file various certified campaign reports, S.C. Code Ann. § 8-13-1308; (4) comply with bank account requirements, S.C. Code Ann. § 8-13-1312; (5) comply

with a $3,500 contribution limit, S.C. Code. Ann. § 8-13-1322[5]; (6) reject anonymous contributions, S.C. Code Ann. § 8-13-1324; (7) comply with prohibitions on certain expenditures or contributions, § 8-13-1332; (8) solicit contributions in places other than on capitol grounds and capitol office complexes, S.C. Code § 8-13-1336; (9) comply with the prohibition on personal use of campaign funds, S.C. Code Ann. § 8-13-1348; (10) comply with dissolution requirements, S.C. Code Ann. § 8-13-1368; (11) provide self-identification in election-related communications, S.C. Code Ann. § 8-13-1354; (12) disclose information required by contribution and expenditure reporting forms, S.C. Code Ann. § 8-13-1360; (13) file a statement of inactivity when necessary, S.C. Code Ann. § 8-13-1362; (14) comply with requirements concerning use of surplus funds, S.C. Code Ann. § 8-13-1370; and (15) risk criminal or civil penalties for non-compliance, S.C. Code §§ 8-13-1510, 1520.

Both the federal and state governments have a long history of disclosure requirements in the election context. The earliest federal disclosure law was enacted on June 25, 1910, just over one hundred years prior to the controversy now before this Court. However, the analysis of the South Carolina provisions challenged in this action begins, "as does nearly any analysis of the constitutionality of campaign finance regulation," North Carolina Right to Life Inc., v. Leake, 525 F.3d 274, 281 (4th Cir. 2007), with the Supreme Court's landmark decision in Buckley v. Valeo, 424 U.S. 1 (1976) ("Buckley"). In Buckley, the Supreme Court addressed several challenges to the Federal Election Campaign Act of 1971 ("FECA"). FECA contained numerous restrictions

---

[5]Subsequent Ethics Commission Advisory Opinions limit the reach of the $3,500 contribution limitation by noting that funds contributed to a committee for the purpose of creating a Section 8-13-1300(31)(c) communication, such as a voter guide, is not considered a "contribution" for purposes of the Ethics Act. Thus, the $3,500 contribution limit does not apply to contributions made to a committee solely for the purpose of creating a Section 8-13-1300(31)(c) communication. House Legislative Ethics Committee Opinion 2006-3, (Doc. #16). Because funds contributed for the purpose of distributing a Section 8-13-1300(31)(c) communication do not qualify as a contribution, the funds are also subject to disclosure requirements under the Ethics Act. State Ethics Commission Advisory Opinion AO2006-004, (Doc. #16).

including limits on campaign contributions by individuals, limits on expenditures by individuals and groups that were made "relative to a clearly identified candidate," and public disclosure requirements for contributions and expenditures above certain threshold levels. <u>Buckley</u> at 7. In deciding <u>Buckley</u>, the Court "recognized that legislatures have the well established power to regulate elections, . . . and that pursuant to that power, they may establish standards that govern the financing of political campaigns." <u>North Carolina Right to Life Inc., v. Leake</u>, 525 F.3d 274, 281 (4th Cir. 2007) ("<u>Leake</u>") (citing <u>Buckley</u>, 424 U.S. at 13, 26). The Supreme Court "simultaneously noted, however, that campaign finance restrictions 'operate in an area of the most fundamental First Amendment activities,' and thus threaten to limit ordinary 'political expression.'" <u>Id.</u> (quoting <u>Buckley</u>, 424 U.S. at 14).

Based on these competing concerns, the Supreme Court "recognized the need to cabin legislative authority over elections in a manner that sufficiently safeguards vital First Amendment Freedoms." <u>Leake</u> at 281. The Court "did so by demarcating a boundary between regulable election-related activity and constitutionally protected political speech." <u>Id.</u> In addressing the comprehensive disclosure provisions set forth in FECA, the Supreme Court held that "campaign finance laws may constitutionally regulate only those actions that are 'unambiguously related to the campaign of a particular . . . candidate.'" <u>Id.</u> (quoting <u>Buckley</u>, 424 U.S. at 80). As the Fourth Circuit noted, this holding is based on the recognition that "only unambiguously campaign related communications have a sufficiently close relationship to the government's acknowledged interest in preventing corruption to be constitutionally regulable." <u>Id.</u>

The "unambiguously campaign related" standard was of particular significance in determining the scope of regulations directed at political committees. As evidenced by the South

Carolina Ethics Act, "designation as a political committee often entails a significant regulatory burden." Leake at 274. The Supreme Court noted that expenditures by political committees could "be assumed to fall within the core area sought to be addressed by Congress," because the expenditures of these groups were, "by definition, campaign related." Buckley at 79. See Leake at 287 ("Buckley applied this same 'unambiguously campaign related' requirement when analyzing the permissible scope of political committee regulation"); National Right to Work Legal Defense and Education Foundation v. Herbert, 581 F. Supp. 2d 1132, 1153 (D. Utah 2008) ("Buckley applied the same unambiguously campaign related standard to the permissible scope of political committee regulation"). FECA broadly defined "political committee" as "any committee, club, association, or other group of persons which receives contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000." 2 U.S.C. § 431(d) (1970 ed., Supp. IV). The Supreme Court recognized that the definition could be "interpreted to reach groups engaged purely in issue discussion." Buckley at 79. To prevent the regulations from reaching groups engaged primarily in issue advocacy, the Supreme Court concluded that the definition of political committee "need only encompass organizations that are under the control of a candidate or ***the major purpose of which is the nomination or election of a candidate***." Buckley at 80 (emphasis added). This construction of the term "political committee" as applied to non-candidate organizations has come to be known as the "major purpose" test. Colorado Right to Life Committee, Inc. v. Coffman, 498 F.3d 1137, 1152 (10th Cir. 2007) (citing FEC v. Akins, 524 U.S. 11 (1998)).

The Fourth Circuit examined the major purpose test as it relates to state political committee designations in detail in North Carolina Right to Life v. Leake, 525 F.3d 274, 286 (4th Cir. 2008). In Leake, the plaintiff North Carolina Right to Life, Inc. contended that the North Carolina definition

of "political committee" was unconstitutionally overbroad and vague for failure to incorporate the

major purpose test. The North Carolina statute at issue defined political committee as:

> a combination of two or more individuals . . . that makes or accepts anything of value to make, contributions or expenditures and has one or more of the following characteristics:
>
> > a.  Is controlled by a candidate;
> >
> > b.  Is a political party or executive committee of a political party or is controlled by a political party or executive committee of a political party;
> >
> > c.  Is created by a corporation, business entity, insurance company, labor union, or professional association pursuant to § 163-278.19(b); or
> >
> > d.  **Has *a* major purpose to support or oppose the nomination or election of one or more clearly identified candidates.**

N.C. Gen. Stat. § 163-278.6(14), amended by N.C. Sess. Laws 2007-391 (emphasis added).

More specifically, the plaintiffs contended that the North Carolina definition of political committee

was unconstitutional because it attempted to regulate entities that had only "*a* major purpose" of

supporting or opposing a candidate rather than entities that had "*the* major purpose" of supporting

or opposing a candidate. Id. at 287 (emphasis in original).

The Fourth Circuit held that "in light of Buckley's goals, it is clear that the importance the

plaintiffs attach to the definite article is correct," and that "Buckley's articulation of the permissible

scope of political committee regulation is best understood as an empirical judgment as to whether

an organization primarily engages in regulable, election-related speech." Id. Therefore, the Fourth

Circuit noted that "the Court in Buckley must have been using '*the* major purpose' test to identify

organizations that had the election or opposition of a candidate as their only or primary goal – this

ensured that the burdens facing a political committee largely fell on election-related speech, rather

than on protected political speech." Id. (citing Buckley at 79) (emphasis in original). The Fourth Circuit went on to note that "[i]f organizations were regulable merely for having the support or opposition of a candidate as 'a major purpose,' political committee burdens could fall on organizations primarily engaged in speech on political issues unrelated to a particular candidate." Id. at 287-88. The Fourth Circuit concluded that "[t]his would not only contravene both the spirit and the letter of Buckley's 'unambiguously campaign related' test, but it would also subject a large quantity of ordinary political speech to regulation." Id.

In striking the North Carolina definition of committee as unconstitutional, the Fourth Circuit noted that "[p]ermitting the regulation of organizations as political committees when the goal of influencing elections is merely one of multiple 'major purposes' threatens the regulation of too much ordinary political speech to be constitutional." Id. at 288-89. The Court stated that "the entire aim of Buckley's 'the major purpose' test was to ensure that all entities subjected to the burdens of political committee designation were engaged primarily in regulable, election-related speech," and that "[b]y diluting Buckley's test and regulating entities that have the opposition or support of political candidates as merely 'a major purpose,' North Carolina runs the risk of burdening a substantial amount of constitutionally protected political speech." Id. at 289. The Fourth Circuit concluded that "[a] single organization can have multiple 'major purposes,' and imposing political committee burdens on a multi-faceted organization may mean that North Carolina is regulating a relatively large amount of constitutionally protected speech unrelated to elections merely to regulate a relatively small amount of election-related speech." Id. This Court finds that the Leake analysis dictates the decision in this case.

The record indicates that the South Carolina definition of committee contains constitutional infirmities similar to those addressed by the Fourth Circuit in Leake.  While the State of North Carolina attempted to incorporate a form of Buckley's major purpose test into its definition of political committee, the South Carolina Ethics Act creates committee restrictions without any reference to an entity's major purpose.  The South Carolina Ethics Act provides that committee restrictions apply to any group that makes an expenditure in excess of five hundred dollars on "any communication, not more than forty-five days before an election, which promotes or supports a candidate or attacks or opposes a candidate, regardless of whether the communication expressly advocates a vote for or against a candidate."  S.C. Code Ann. §§ 8-13-1300(6), 1300(31)(c).  Thus, an entity that spends several million dollars annually on issue advocacy or community outreach can be required to register as a committee under South Carolina law if the group decides to spend five hundred and one dollars on a campaign related communication.  Without the incorporation of the "major purpose" test into the statute, this result is inconsistent with both Buckley and Leake.

Other Courts analyzing similar definitions of committee have reached the same result.  In Colo. Right to Life Comm. Inc. v. Coffman, 498 F.3d 1137 (10th Cir. 2007), the Tenth Circuit Court of Appeals considered an as-applied challenge to the Colorado definition of political committee.  The Colorado Constitution defined a "political committee" as "any person, other than a natural person, or any group of two or more persons, including natural persons that have accepted or made contributions or expenditures in excess of $200 to support or oppose the nomination or election of one or more candidates."  Id. at 1152 (citing Colorado Const. art. XXVII, § 2(12)(a)).  The Tenth Circuit noted that under the state definition of political committee, "any group that spends more than $200 a year to support or oppose the nomination or election of one or more candidates is subject to

the State's various administrative, organizational, and reporting requirements." Id. at 1153. In concluding that the statute was unconstitutional, the district court below held that the two hundred dollar trigger, standing alone, was incompatible with the major purpose test, and that the "amount of money an organization must accept or spend – $200 – is not substantial and would, as a matter of common sense, operate to encompass a variety of entities based on an expenditure that is insubstantial in relation to their overall budgets." Id. (quoting Colo. Right to Life Comm. v. Davidson, 395 F. Supp. 2d 1001, 1021 (D. Colo. 2005)). The district court added that under the state definition, "an entity that spends $200,000 on various non-political activities and donates $200 (1/10 of 1% of its budget) to a candidate is deemed a political committee." Id. The Tenth Circuit affirmed the district court, noting "that the $200 trigger, standing alone, cannot serve as a proxy for the 'major purpose' test as applied" to the plaintiff in the case. Id. at 1154.

The Tenth Circuit recently affirmed the New Mexico District Court's determination that the New Mexico definition of political committee contained similar constitutional infirmities in the case of New Mexico Youth Organized v. Herrera, 611 F.3d 669 (10th Cir. 2010). The New Mexico definition provided that a political committee must be "operated primarily for a political purpose," but expanded the definition to include, by default, any organization that spends over $ 500 in one year on a political ad campaign. Id. at 673 (quoting NMSA § 1-19-26 (L)). The district court below noted that "[a]lthough the use of 'primarily for a political purpose' tracks Buckley's 'major purpose' language, the statute completely subverts that test by classifying an electioneering expenditure greater than $ 500 as irrefutably constituting the organization's primary purpose, regardless of what percentage of operating funds the expenditure constituted or what else the organization spent its resources on." New Mexico Youth Organized v. Herrera, 2009 U.S. Dist. LEXIS 125104 (D.N.M.

2009) at *44-45. The district court further noted that "[b]y defining spending over $500 on an election-related ad as sufficient to subject an organization to the full panoply of regulations otherwise reserved solely for organizations whose primary purpose is to advocate for or against candidates, the statute renders the 'major purpose' test completely superfluous." Id.

The district court went on to examine the annual budgets of the two plaintiff organizations in the case, and noted that under the New Mexico law "these organizations would be classified as 'political committees' if they spent as little as 2/10 of one percent and 5/100 of one percent of their budgets . . . on electioneering communications." Id. at *46. The district court noted, "the state has the authority to regulate contributions and expenditures supporting express advocacy or its functional equivalent, but the state is without the authority to compel an organization to register as a political committee on the basis of such expenditures alone if the organization's major purpose is not the nomination or election of a candidate." Id. at *47. The district court concluded that the New Mexico statute contained "no middle ground that incorporates disclosure requirements governing only electioneering communications," but that, "[i]nstead, by requiring those organizations that make even minor expenditures on electioneering communications to register as political committees, the [New Mexico] Campaign Reporting Act, as applied to Plaintiffs, impermissibly 'regulate[s] a relatively large amount of constitutionally protected speech unrelated to elections merely to regulate a relatively small amount of election-related speech.'" Id. at *49-50 (quoting Leake, 525 F.3d 274, 289 (4th Cir. 2008)). The Tenth Circuit affirmed the district court's grant of summary judgment, concluding that the New Mexico statute was unconstitutional as applied to the two plaintiff organizations. Herrera, 611 F.3d at 679.

In <u>Nat'l Right to Work Legal Defense and Educ. Found. v. Herbert</u>, 581 F. Supp. 2d 1132 (D. Utah 2008), the Utah District Court examined the constitutionality of the Utah definition of "political issues committee." Utah defined a political issues committee as "an entity, or any group of individuals or entities within or outside this state, that solicits or receives donations from any other person, group, or entity or makes disbursements to influence, or to intend to influence, directly or indirectly, any person to . . . assist in placing a ballot proposition on the ballot . . . " <u>Id.</u> at 1152 (quoting Utah Code Ann. § 20A-11-101(28)). The Court noted that being "designated a political issues committee in Utah imposes substantial burdens on organizations," including requirements that the committee "file a statement of registration, disclosing all of the organization's officers, board members, and any other entities or corporations the organization affiliates with or represents." <u>Id.</u> The political issues committees were also required to "file periodic and continuous financial statements, which detail the organization's contributors and the amount contributed." <u>Id.</u> The court noted that the "burdensome disclosure requirements may provide a disincentive for many individuals and entities to engage in activities that might classify them as a member of a political issue committee," and that "otherwise protected political speech, such as true issue advocacy, may be self-censored as individuals and entities attempt to avoid a political issues committee designation." <u>Id.</u> at 1152-1153.

The court concluded that "Utah's attempt to regulate entities making *any* . . . disbursements cannot be saved." <u>Id.</u> at 1153 (emphasis in original). The court held that "[w]ith such a broad definition, Utah does not even attempt to comply with <u>Buckley's</u> 'major purpose' requirement, and has pushed the reach of political committee regulation beyond constitutional limits." <u>Id.</u> The court, therefore, held that the state definition was unconstitutional on its face. <u>Id.</u>

Like the regulations in the above cited cases, the South Carolina Ethics Act imposes numerous burdens on entities that qualify as committees under S.C. Code Ann. § 8-13-1300(6) without reference to the entity's major purpose. As previously stated, the Ethics Act imposes approximately fifteen burdens of varying degree. These burdens include requirements that each committee file recurring certified campaign reports; maintain records of contributions, contributors, and expenditures; comply with various bank account requirements; reject anonymous and cash contributions; and disclose information about contributions and expenditures. The Ethics Act also includes a provision that prevents a committee from accepting more than $3,500 annually in contributions from any individual donor. S.C. Code Ann. § 8-13-1322. The Ethics Committee has limited the reach of this provision in recent Advisory Opinions, determining that any funds donated for the purpose of allowing a committee to distribute communications pursuant to 8-13-1300(31)(c) which promote or supports a candidate or attacks or opposes a candidate within forty-five days of any election – such as voter guides – do not qualify as "contributions." House Legislative Ethics Committee Opinion 2006-3, (Doc. #16). Because these funds do not qualify as "contributions" under the Ethics Act, funds donated for this purpose would not be subject to the $3,500 limit on contributions. House Legislative Ethics Committee Opinion 2006-3, (Doc. #16). Funds used for this purpose are also not subject to the disclosure requirements applicable to funds which qualify as "contributions" under the Ethics Act. State Ethics Commission Advisory Opinion AO2006-004, (Doc. #16). However, these subsequent limitations on the contribution limits set forth at Section 8-13-1322 do not eliminate the threat that the contribution limits will suppress a committee's ability to speak. As a whole, the provisions of the Ethics Act place significant burdens on groups that

qualify as committees without meaningful consideration of the group's major purpose, thereby threatening to chill significant First Amendment rights.

As the Fourth Circuit highlighted in <u>Leake</u>, state legislatures may further goals of allowing transparency and preventing corruption in the election process without placing extensive committee burdens on all groups that engage in election-related speech. In addressing North Carolina's previous statutory scheme, the Fourth Circuit recognized that "North Carolina is surely right to think that organizations – particularly large organizations – can have a substantial impact on the electoral process even if influencing elections is merely one of their many 'major purposes.'" <u>Leake</u> at 290. However, the Fourth Circuit added that "[w]hen faced with such organizations, however, North Carolina does not have to impose the substantial burdens of political committee designation to achieve its goal of preventing corruption." <u>Id.</u> The Fourth Circuit noted that "[i]nstead, North Carolina could impose one-time reporting requirements – as it already does on certain individual expenditures and contributions by non-political committee organizations." <u>Id.</u> The Fourth Circuit concluded that "[i]n doing so, North Carolina would produce the same benefits of transparency and accountability while only imposing regulatory burdens on communications that are 'unambiguously campaign related.'" <u>Id.</u> (citing <u>Buckley</u> at 80).

Indeed, federal law provides for one-time disclosures similar to those alluded to by the Fourth Circuit in <u>Leake</u>. Federal election provisions require that every person that makes a disbursement in excess of $10,000 for the direct costs of producing and airing an electioneering communication shall file a one-time report disclosing the identification and principal place of business of the person making the disbursement, and the names of individuals contributing $1,000 or more towards the cost of the disbursement. 2 U.S.C. § 434(f). The Supreme Court recently cited these provisions with

favor in <u>Citizens United v. Federal Election Commission</u>, __ U.S. __, 130 S.Ct. 876, 913-917 (2010), rejecting an as-applied challenge to the application of these provisions. In addressing South Carolina's current statutory scheme at the hearing on this matter, counsel for the plaintiff summarized:

> [t]he fact that they don't have one time reports is simply their problem. They should have adopted a statute like federal law that requires a one time report. And they can't substitute now, well, we don't have one time reports, so therefore, we can make everybody become a P.A.C. [political action committee]. No. That's unconstitutional, and if this Court strikes that down, then they can adopt a constitutional statute that requires the one time report.

> Summ. J. Tr. at p. 68:5-12.

This Court concludes that the committee provisions of the South Carolina Ethics Act at issue simply sweep too far. The committee definition set forth at S.C. Code Ann. § 8-13-1300(6) is in direct conflict with the Fourth Circuit's decision in <u>Leake</u>, and therefore requires invalidation by this Court.

Further, the Fourth Circuit's analysis with regard to political committee designations in <u>Leake</u> has not been called into question by any subsequent Supreme Court decision. The Supreme Court's 2007 decision in <u>WRTL</u>, cited repeatedly by the Fourth Circuit in <u>Leake</u>, did not reach the issue of political committee designation now before this Court. Similarly, the issue of the major purpose test as it relates to political committee designation was not addressed in the recent decision in <u>Citizen's Citizens United v. Federal Election Commission</u>, __ U.S. __, 130 S.Ct. 876 (2010) . While the Supreme Court did have occasion to note the burdensome nature of the federal political action committee regulations in <u>Citizens United</u>, the Court did not squarely address the requirements for imposing committee status on organizations. <u>Id.</u> at 897. Thus, the Fourth Circuit's analysis on the

issue of the major purpose test in <u>Leake</u> has not been altered by a subsequent decision, and this Court is, therefore, bound by the Fourth Circuit's analysis in that case.

As a final matter, the Court does not conclude that it would be appropriate to apply a limiting construction to S.C. Code Ann. § 8-13-1300(6). As the Supreme Court has noted, "[i]t has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it would be upheld." <u>Virginia v. American Booksellers Ass'n, Inc.</u>, 484 U.S. 383, 397 (1988) (citing <u>Erznoznik v. City of Jacksonville</u>, 422 U.S. 205, 1975)). However, the Court added that the "key to application of this principle is that the statute must be 'readily susceptible' to the limitation; we will not rewrite a state law to conform it to constitutional requirements." <u>Id.</u> Though the defendants suggest that the challenged provision is susceptible to a limiting construction, no such construction has been presented to the Court. The Court finds that limiting the application of S.C. Code. Ann. § 8-13-1300(6) only to groups that have the major purpose of influencing the outcome of an election would be tantamount to rewriting the state statute. This is particularly true in this instance, where the "committee" definition invalidated herein is a component of a comprehensive legislative scheme that involves detailed regulations governing all entities that are encompassed by the statutory definition. The revision of the statutory scheme is a task best-suited to the state legislature, and the Court concludes that application of a limiting construction is not appropriate in this case.

For the reasons set forth herein, the plaintiff's motion for summary judgment on its first ground for relief is hereby **GRANTED**, (Doc. #108), and the Court hereby concludes that the definition of "committee" located at S.C. Code Ann. § 8-13-1300(6) is facially invalid on the ground that the definition is unconstitutionally overbroad.

## II.  Overbreadth Challenge to South Carolina's Definition of "Influence."

The plaintiff's second cause of action is that the South Carolina definition of "influence the outcome of an elective office" is unconstitutionally overbroad.  As noted above, "influence the outcome of an elective office" is a phrase incorporated within the South Carolina definition of committee.  The phrase serves as one of multiple triggers that can place "committee" status on an entity.  The phrase is separately defined within the Ethics Act.  The specific definition provides that:

> "**Influence the outcome of an elective office**" means:
>
> (a) expressly advocating the election or defeat of a clearly identified candidate using words including or substantially similar to "vote for", " elect", "cast your ballot for", "Smith for Governor", "vote against", " defeat", or "reject";
>
> (b) communicating campaign slogans or individual words that, taken in context, have no other reasonable meaning other than to urge the election or defeat of a clearly identified candidate including or substantially similar to slogans or words such as "Smith's the One", "Jones 2000", "Smith/Jones" , "Jones!", or "Smith-A man for the People!"; or
>
> (c) **any communication made, not more than forty-five days before an election, which promotes or supports a candidate or attacks or opposes a candidate, regardless of whether the communication expressly advocates a vote for or against a candidate.** For purposes of this paragraph, "communication" means (i) any paid advertisement or purchased program time broadcast over television or radio; (ii) any paid message conveyed through telephone banks, direct mail, or electronic mail; or (iii) any paid advertisement that costs more than five thousand dollars that is conveyed through a communication medium other than those set forth in subsections (i) or (ii) of this paragraph. "Communication" does not include news, commentary, or editorial programming or article, or communication to an organization's own members.

S.C. Code Ann. § 8-13-1300(31) (emphasis added).

The Court has already determined that the South Carolina definition of committee, a definition that incorporates the phrase "influence the outcome of an elective office," is unconstitutional under the

analysis set forth by the Fourth Circuit in <u>Leake</u>.  Therefore, the plaintiff's second cause of action is no longer viable.  However, the Court will briefly address the merits of the plaintiff's overbreadth challenge to this phrase.

Much like the preceding analysis, an examination of the constitutionality of the phrase "influence the outcome of an elective office" begins with the Supreme Court's analysis in <u>Buckley</u>. As set forth above, <u>Buckley</u> established the proposition that campaign finance legislation should only attempt to regulate activities or spending that is  "unambiguously related to the campaign of a particular . . . candidate."  <u>Buckley</u> at 80.  In addition to examining the scope and implications of "political committee" designations, the Court in <u>Buckley</u> also analyzed the extent to which FECA could permissibly regulate various campaign-related communications.

Along these lines, the Supreme Court addressed the constitutionality of two specific FECA provisions at issue in <u>Buckley</u>.  The first provision placed a $1,000 limitation on independent expenditures "relative to a clearly identified candidate."  <u>Buckley</u> at 44 (citing 18 U.S.C. § 608(e)(1)).  The second provision imposed disclosure requirements on every person making "political contributions or expenditures" in excess of $ 100 per year.  <u>Id.</u> at 74-75 (citing 2 U.S.C. § 434(e)).  FECA further defined both "contributions" and "expenditures" in parallel provisions as donations of money or other assets "for the purpose of . . . influencing the nomination . . . or election" of a candidate for federal office.  <u>Id.</u> at 76 (quoting 2 U.S.C. § 431(e), (f)).

In addressing the $1,000 limitation on independent expenditures, the Court held that the reach of the provision would require limitation to avoid invalidation on vagueness grounds.  The Court held that the $1,000 limit on independent expenditures "must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly

identified candidate for federal office." Id.  The Court noted that such a construction would restrict the application of the statute to "communications containing express words of advocacy such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' reject." Id. at 44 n. 52.

In addressing the "contribution" and "expenditure" provisions set forth at 2 U.S.C. § 431(e) and (f), the Court also held that limiting constructions were required to allow these provisions to meet constitutional scrutiny.  The Court concluded that regulable "contributions" were limited to donations made directly or indirectly to a candidate, political party, or a campaign committee, those contributions made to other organizations that are specifically earmarked for political purposes, and expenditures made in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate. Id. at 78.  The Court construed "expenditures" in the same manner that it construed "independent expenditures" in 18 U.S.C. § 608(e), as reaching "only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." Id. at 80.  The Court concluded by noting that this "reading is directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate." Id.

Thus, the Supreme Court held in Buckley that legislatures may regulate "communications that in express terms advocate the election or defeat of a clearly identified candidate for" public office. Id. at 44.  The Court went on to delineate specific words that exemplify this "express advocacy" such as, "'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" Id.  As the Fourth Circuit summarized, "Buckley  thus stands for the proposition that legislatures may constitutionally regulate communications that use the obviously campaign-related 'magic words of express advocacy.'" Leake at 282 (citing Fed. Election Comm'n

23

v. Wisconsin Right to Life, Inc., 551 U.S. 449, 495 (2007) (Scalia, J., dissenting)).  The Fourth Circuit added that "[f]ocusing regulation in this way ensures that campaign finance restrictions do not sweep so broadly as to restrict ordinary political speech."  Id.

In 2002, Congress enacted the Bipartisan Campaign Reform Act (BCRA) which contained a series of amendments to FECA.  The Supreme Court noted that as a result of the Court's "strict reading" of various FECA provisions in Buckley, "the use or omission of 'magic words' such as "Elect John Smith' or 'Vote Against Jane Doe' marked a bright statutory line separating 'express advocacy' from 'issue advocacy.'" McConnell v. Federal Election Comm., 540 U.S. 93, 126 (2003).  In the years following Buckley, the Supreme Court recognized that "[w]hile the distinction between 'issue' and express advocacy seemed neat in theory, the two categories of advertisements proved functionally identical in important respects," and that both forms "were used to advocate the election or defeat of clearly identified federal candidates, even though the so-called issue ads eschewed the use of magic words."  Id.  The Court noted that "[l]ittle difference existed, for example, between an ad that urged viewers to 'vote against Jane Doe' and one that condemned Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe and tell her what you think.'"  Id. at 127. The Court concluded that "Buckley's express advocacy line, in short, has not aided the legislative effort to combat real or apparent corruption," and that, in response, "Congress enacted BCRA to correct the flaws it found in the existing system."  Id.  at 93-94.

One way in which Congress attempted to correct these perceived flaws was through the creation of the term "electioneering communications."  This term was "intended to replace the narrowing construction of FECA's disclosure provisions adopted by [the] Court in Buckley," and the newly defined term was not limited to communications that expressly advocated the election or

defeat of particular candidates.  Id. at 189.  Instead, "electioneering communication" was defined broadly as any "broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal Office" and is made within "60 days before a general, special or runoff election" or "30 days before a primary or preference election."  Id. (citing 2 U.S.C. § 434(f)(3)(A)(i)).

In McConnell v. Federal Election Comm., 540 U.S. 93 (2003) ("McConnell"), the Court addressed numerous challenges to the recently enacted BCRA legislation, including a facial challenge to the new definition of "electioneering communication." The plaintiffs argued that the definition was overly broad because it did not limit the BCRA's application to communications that constituted "express advocacy" under the Court's holding in Buckley.  The Court rejected this facial challenge, concluding that there was no overbreadth concern with the BCRA's definition of "electioneering communication" to the extent that the regulable speech in question was the "functional equivalent" of express advocacy.  Id. at 204-206.  However, as the Supreme Court later clarified, the McConnell Court "did not explain that it was adopting a particular test for determining what constituted the 'functional equivalent of express advocacy.'"  Federal Election Commission v. Wisconsin Right to Life, Inc., 551 U.S. 449, 466 (2007) ("WRTL").

In WRTL, the Court considered an as-applied challenge to the BRCA's definition of electioneering communication.  In considering the appropriate test to apply in determining what constituted the "functional equivalent of express advocacy," the Court held that "a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as *an appeal to vote for or against a specific candidate*." WRTL at 469-70 (emphasis added).  The Court concluded by noting that "[d]iscussion of issues

cannot be suppressed simply because the issues may also be pertinent in an election," and that "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor." Id. at 474.

The Fourth Circuit provided a concise summary of the above line of cases in Leake. The Fourth Circuit noted that, "[t]o date, the Court has only recognized two categories of activity that fit within Buckley's unambiguously campaign related standard." Leake at 281. The Fourth Circuit highlighted that, "[f]irst, legislatures may regulate 'communications that in express terms advocate the election or defeat of a clearly identified candidate for' public office." Id. (citing Buckley at 44). The Fourth Circuit went on to note that "[s]econd, the Supreme Court has recently held that legislatures have a very limited authority to regulate campaign communications that are 'the functional equivalent of express advocacy.'" Id. at 282 (citing McConnell at 206). The Supreme Court in McConnell stated that "strict adherence to Buckey's approach could render the legislative power to regulate elections 'functionally meaningless,'" and that "[t]he Court thus defined a category of activity – beyond the 'magic words' identified in Buckley – to be regulable as the 'functional equivalent of express advocacy.'" Id. (citing McConnell at 193). However, as the Fourth Circuit recognized, "[i]n order to protect political expression . . . the Court has narrowly circumscribed this category, because any attempt to identify communications as election-related without focusing on words that explicitly label them as such threatens to infringe on protected First Amendment liberties." Id.

In light of these concerns, the Fourth Circuit observed that "to be considered the 'functional equivalent of express advocacy,' a communication must meet two separate requirements." Id. The first requirement is that "the communication must qualify as an 'electioneering communication,' defined by the [BCRA] as a 'broadcast, cable, or satellite communication' that refers to a 'clearly

identified candidate' within sixty days of a general election or thirty days of a primary election." Id. (citing WRTL at 474 n. 7). Second, "a communication can be deemed the 'functional equivalent of express advocacy only if [it] is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.'" Id. (citing WRTL at 469-70). The Fourth Circuit added that "[t]he purpose of this requirement is to avoid chilling political expression by forcing a speaker to have to defend his communication from regulation." Id.

The Supreme Court revisited its prior holding in McConnell in the recent case of Citizens United v. Federal Election Commission, __ U.S. __, 130 S.Ct. 876 (2010) ("Citizens United"). Directly at issue in Citizens United was the BRCA provision that prohibited corporations and unions from using general treasury funds to make independent expenditures for electioneering communications. 2 U.S.C. § 441(b). Prior to the enactment of the BRCA, federal law prohibited corporations and unions from "using general treasury funds to make direct contributions to candidates or independent expenditures that expressly advocate the election or defeat of a candidate, through any form of media, in connection with certain qualified federal elections." Id. at 887 (citing 2 U.S.C. 441(b) (2000 ed.)). The BRCA amended § 441(b) to prohibit corporations and unions from using general treasury funds for making any electioneering communication as well. Id. The Supreme Court addressed these corporate limits, and invalidated 2 U.S.C. § 441(b)'s restrictions on corporate independent expenditures. Id. at 913. In so doing, the Court noted that it was "required to overrule the part of McConnell that upheld BCRA § 203's extension of § 441b's restrictions on corporate independent expenditures." Id.

The Supreme Court also addressed the disclaimer and disclosure requirements contained in the BCRA. The BCRA disclaimer requirements provide that televised electioneering

27

communications must include a disclaimer identifying the party responsible for the content of the advertising. 2 U.S.C. § 441(d)(2). The BCRA disclosure requirements provide that any person who spends more than $10,000 on electioneering communications within a calendar year must file a disclosure statement with the FEC that identifies the person making the expenditure, the amount of the expenditure, the election to which the communication was directed, and the names of certain contributors. 2 U.S.C. §§ 434(f)(1), (2). The Court noted that "[d]isclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,'" and "'do not prevent anyone from speaking.'" Id. at 914 (citing Buckley at 64, McConnell at 201). The Court added that it has "subjected these requirements to 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." Id. (citing Buckley at 64, 66, McConnell at 231-232).

The Court first upheld the disclaimer provisions, noting that the disclaimers required under the BCRA "'provid[e] the electorate with information,' . . . 'insure that the voters are fully informed' about the person who is speaking," and "[a]t the very least, . . . avoid confusion by making clear that the ads are not funded by a candidate or political party." Id. at 915 (citing McConnell at 196, Buckley at 76, 96). The Supreme Court then addressed the disclosure requirements, noting that "disclosure is a less restrictive alternative to more comprehensive regulations of speech." Id. The Court delineated three justifications for its ruling. First, the Court noted that "[i]n Buckley, the Court upheld a disclosure requirement for independent expenditures even though it invalidated a provision that imposed a ceiling on those expenditures." Id. (citing Buckley at 75-76). Second, the Court noted that "[i]n McConnell, three justices who would have found § 441 (b) to be unconstitutional nonetheless voted to uphold BCRA's disclosure and disclaimer requirements." Id. (citing

McConnell at 321 (opinion of Kennedy, J., joined by Rehnquist, C.J., and Scalia, J.)). Third, the Court noted that it "has upheld registration and disclosure requirements on lobbyists, even though Congress has no power to ban lobbying itself." Id. (citing United States v. Harriss, 347 U.S. 612, 525 (1954)). The Supreme Court concluded that, "[f]or these reasons, we reject Citizen United's contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy." Id.

The plaintiffs in the case before this Court assert an overbreadth challenge to subsection (c) of South Carolina's definition of "influence the outcome of an elective office." This section provides that "influence the outcome of an elective office" means "any communication made, not more than forty-five days before an election, which promotes or supports a candidate or attacks or opposes a candidate, regardless of whether the communication expressly advocates a vote for or against a candidate." S.C. Code Ann. § 8-13-1300(31). The plaintiffs appear to concede that subsections (a) and (b) of the definition encompass "express advocacy" that may be subjected to regulation under the cases cited above. The plaintiffs contend, however, that subsection (c) is unconstitutionally overbroad. As previously stated, the challenged "influence the outcome" phrase is specifically incorporated into the South Carolina Ethics Act's definition of committee set forth at S.C. Code Ann. § 8-13-1300(6). Because the definition of committee found at 8-13-1300(6) has been invalidated by this Court's ruling herein, as set forth in Section I above, the plaintiff's challenge to § 8-13-1300(31) does not form a basis for the ruling in this case.

As a practical matter, however, it appears that subsection (c) of the definition of "influence the outcome of an elective office" is South Carolina's attempt to define activities that constitute the "functional equivalent" of express advocacy. Thus, through this definition, the state attempts to

define the types of election-related communications that may be subject to some form of state regulation. Prior to the decision in <u>Citizens United</u>, the Fourth Circuit provided guidance to state legislatures attempting to define the scope of permissible regulation in <u>Leake</u>. The Court first noted that to be subject to regulation, a "communication must qualify as an 'electioneering communication,' defined by the [BCRA] as a 'broadcast, cable, or satellite communication' that refers to a 'clearly identified candidate' within sixty days of a general election or thirty days of a primary election." <u>Id.</u> (citing <u>WRTL</u> at 479 n. 7). It appears that South Carolina's attempt to define the forms of regulable election-related communications is broader than the BCRA definition in some respects. While the BCRA definition of electioneering communications includes broadcast, cable, and satellite communications, South Carolina law provides that regulable communications include television and radio advertisements as well as communications made through telephone bank, direct mail, electronic mail, and any paid advertisements conveyed through an unenumerated medium that cost more than five thousand dollars. S.C. Code Ann. § 8-13-1300(c)(i)-(iii). Also, the BCRA imposes restrictions on electioneering communications that occur within 60 days before a general election and 30 days before a primary election. The South Carolina definition of "influence" includes communications made 45 days before an election without reference to whether the election is a general or a primary election, thereby extending the window during which communications prior to a primary election may be subjected to regulation.

Further, the BCRA requires that a regulable communication refer to a "***clearly identified*** candidate." 2 U.S.C. § 434(f) (emphasis added). The South Carolina definition of influence the outcome of an elective office includes "any communication made, not more than forty-five days before an election, which promotes or supports ***a candidate*** or attacks or opposes ***a candidate***,

regardless of whether the communication expressly advocates a vote for or against a candidate." S.C. Code Ann. § 8-13-1300(31) (emphasis added). The plaintiffs contend that the absence of the "clearly identified" language renders the South Carolina standard significantly more broad than the standard set forth within the BCRA. The plaintiffs further argue that the absence of this phrase allows South Carolina to regulate communications that make no mention of any candidate at all, but merely include general or contextual references to a particular candidate.

The second requirement set forth in Leake was that "a communication can be deemed the 'functional equivalent of express advocacy only if [it] is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.'" Id. (citing WRTL at 469-70). Despite the fact that the South Carolina definition is more broad in scope than the federal definition of electioneering communication, it appears to the Court that South Carolina's "influence" definition, which includes "any communication . . . which promotes or supports a candidate or attacks or opposes a candidate, regardless of whether the communication expressly advocates a vote for or against a candidate" may very well meet the "appeal to vote" requirement originally articulated by the Supreme Court in WRTL.

Importantly, the Supreme Court drew a distinction between restrictions on independent expenditures and the imposition of disclosure requirements in the recent case of Citizens United. In Citizens United, the Supreme Court held that legislatures may, in certain instances, permissibly impose disclosure requirements on election-related communications even though the communications do not qualify as the functional equivalent of express advocacy. The Court noted that disclosure requirements are subject to "exacting scrutiny" which "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."

Citizens United at 914 (quoting Buckley at 64, 66).  However, the Court rejected the plaintiff's contention that the federal disclosure requirements, like the federal limitations on independent expenditures addressed by the Court in WRTL, must be limited to express advocacy or its functional equivalent.  Id. at 915.

South Carolina's definition of "influence the outcome of an elective office" does reach communication channels, including direct mail and e-mail, that the federal government has previously chosen not to regulate.  However, the Supreme Court's recent ruling in Citizen's United indicates that South Carolina may be constitutionally permitted to require some level of disclosure on organizations based on the dissemination of a communication that "promotes or supports a candidate or attacks or opposes a candidate, regardless of whether the communication expressly advocates a vote for or against a candidate" pursuant to § 8-13-1300(31).  As detailed above, South Carolina cannot constitutionally impose committee restrictions on any group that distributes a communication that qualifies under 8-13-1300(31)(c) without regard for the group's major purpose. Further, any disclosure requirements imposed by the state based on a qualifying Section 8-13-1300(c) communication must satisfy the burden of exacting scrutiny.  However, based on the Supreme Court's recent ruling in Citizen's United, the Court is not prepared to conclude that South Carolina would be unable to impose some level of disclosure requirement on groups that disseminate communications which qualify under Section 8-13-1300(31)(c).  The Court concludes that South Carolina's attempt to define the scope of communications that may be susceptible to some level of regulation does not contain an inherent constitutional infirmity.

### III.  Vagueness Challenge to South Carolina's Definition of "Influence."

In its final ground for relief, the plaintiff has asserted that South Carolina's definition of "influence the outcome of an elective office," addressed in Section II above, is unconstitutionally vague.  The plaintiff specifically argues that the standard of  "promotes or supports a candidate or attacks or opposes a candidate" located within Section 8-13-1300(31)(c) is unconstitutionally vague because the standard lacks clear standards that a person of ordinary intelligence would be able to understand, and because the standard has the potential to reach a substantial amount of constitutionally protected speech.  Like the overbreadth challenge to this phrase discussed above, the plaintiff's third cause of action is no longer viable in light of the Court's ruling in Section I above.  Again, however, the Court will briefly address the plaintiff's challenge.

The Fourth Circuit has noted that "[a] statute can be impermissibly vague for either of two independent reasons."  United Seniors Ass'n, Inc. v. Social Security Administration, 423 F.3d 397, 408 (4th Cir. 2005) (quoting Hill v. Colorado, 530 U.S. 703, 732 (2000)).  The first reason that a statute will be considered unconstitutionally vague is if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits."  Id.  The second situation occurs when a statute "authorizes or even encourages arbitrary and discriminatory enforcement."  Id.

The Supreme Court recently addressed a vagueness challenge to similar language in McConnell.  In McConnell, the Court addressed a challenge to the definition of "Federal election activity" by a political party which included "a public communication that refers to a clearly identified candidate for Federal office . . . and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly

advocates a vote for or against a candidate)." 2 U.S.C. § 431(20)(A)(iii) (parenthesis in original). In rejecting the vagueness challenge, the Supreme Court noted that "[t]he words 'promote,' 'oppose,' 'attack,' and 'support' clearly set forth the confines within which potential party speakers must act in order to avoid triggering the provision." McConnell at 170 n. 64. The Court added that "[t]hese words 'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" Id. (citing Grayned v. City of Rockford, 408 U.S. 104, 108-109 (1972)). The language addressed by the Supreme Court in McConnell was arguably narrower, in that it defined the scope of activity taken by a political party, a group whose activities are "presumed to be in connection with election campaigns." Id. (citing Buckley at 79). However, the Court does not find that the distinction controls in this case. As a practical matter, the challenged language neither fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct is encompassed, nor authorizes or encourages arbitrary and discriminatory enforcement of the Ethics Act. For this reason, the Court does not conclude that the language challenged by the plaintiff is unconstitutionally vague.

## CONCLUSION

For the reasons set forth herein, the defendants' motion for summary judgment is hereby **DENIED**. (Doc. #117). The plaintiff's motion for summary judgment is **GRANTED** as to the plaintiff's first cause of action, (Doc. #108), and the Court hereby concludes that the definition of "committee" located at S.C. Code Ann. § 8-13-1300(6) is facially invalid on the ground that the definition is unconstitutionally overbroad.

**IT IS SO ORDERED**.

          s/ Terry L. Wooten     
United States District Judge

September 13, 2010
Florence, South Carolina